**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

DENNIS STEELE,

    Petitioner,

v.

ERIC LINHARDT, et al.,

    Respondent.

CIVIL ACTION NO. 3:16-CV-1341

(JUDGE CAPUTO)

(MAGISTRATE JUDGE CARLSON)

## MEMORANDUM

Presently before me is the Report and Recommendation ("R&R") of Magistrate Judge Carlson (Doc. 11) regarding a Petition for Habeas Corpus submitted pursuant to 28 U.S.C. § 2241,[1] filed by counsel for the petitioner Dennis Steele ("Petitioner") on June 30, 2016. (Doc. 1). For the reasons that follow, the R&R will be adopted in its entirety and the Petition for Habeas Corpus will be dismissed.

## I. Background

On February 21, 2012, Petitioner was arrested by state authorities and charged with involuntary deviate sexual intercourse, sexual assault, aggravated indecent assault, and indecent assault, related to an alleged sexual contact between Petitioner and his biological granddaughter. (Doc 10, at 1-4).

On October 14, 2013, prior to his trial in state court, Petitioner filed a Motion for an In-Camera Hearing pursuant to Pennsylvania's Rape Shield law, 18 Pa.C.S.A. § 3104, requesting permission to introduce evidence of the granddaughter's sexual activity both before and subsequent to the incident which gave rise to the charges against Petitioner. (Doc. 10, at 2). Specifically, he sought to elicit testimony relating to the granddaughter's sexual activity with her ex-boyfriend, activity which allegedly took place near in time of Petitioner's own sexual encounter with his granddaughter. (Doc. 9-1, at 16-17). Petitioner alleged that the evidence of her sexual conduct was relevant to her credibility and bias. The

---

[1] The petition was initially submitted pursuant to 28 U.S.C § 2254, but has been subsequently amended to seek relief pursuant to § 2241. *See* Doc 5.

trial court denied the motion, finding that the evidence of the victim's sexual conduct was inadmissible under Pennsylvania's Rape Shield Law, 18 Pa.C.S.A. § 3104(a). (*Id.*)

The matter proceeded to trial. The defense theory was that the victim consented to sex with her own grandfather. During cross-examination of the granddaughter, Petitioner's counsel's question elicited a response which prompted the prosecutor to move for a mistrial and that motion was granted by the trial court. The cross-examination was as follows:

> Q: What time did you go to sleep that – that would be the midnight on the 14th of February?
> A: I don't know what time I went to bed that night. I can't give you a time I actually fell asleep, but I know it was late.
> Q: All right. Did anyone come over other – to visit?
> A: Yes.
> Q: Who was that?
> A: My ex-boyfriend .
> Q: What time did he come?
> A: Around three in the morning.
> Q: Did he stay?
> A: He did not stay the night. He was there for an hour and he left.
> Q: What was he doing for that hour?
> Prosecutor: Objection, Your Honor.
> Witness: We were having sex.
> The Court: Wait, wait, wait. Come on forward.
> Prosecutor: Your Honor, I think we need to go in chambers for a moment on the record.
> The Court: All right.

(Doc. 9-1, at 55-56).

Once in chambers, the attorneys and the court engaged in a heated conversation which focused on a request for mistrial by the Commonwealth's prosecutor, Mr. Biichle. Petitioner was represented by Mr. Campana.

> The Court: How can you do that?
> Mr. Campana: Well, okay, I'll move –
> Mr. Biichle: It's out there. She answered it.
> Mr. Campana: She answered that he came over and stayed for an hour.
> Mr. Biichle: And she said we were having sex after I objected because I knew exactly where you were going and you knew what that question was going to it was the Rape Shield, that's a mistrial and it's gotta be a mistrial. It's out there, she answered it, I move for a mistrial—
> Mr. Campana: You can give them a curative instruction. If you give him a mistrial it 's double jeopardy.
> Mr. Biichle: This is a mistrial.
> Mr. Campana: Double jeopardy.
> Mr. Biichle: No, it's not. You know what you are doing, Pete.
> The Court: Why would you ask that question? You know what they were

2

doing.
Mr. Campana: I asked what he was doing. I didn't ask what they were doing, first of all. What was he doing.
The Court: What did he ask? I don't know if it makes a lot of difference.
(Whereupon, the last question was read back.)
Mr. Biichle: You Honor, that's a mistrial.
Mr. Campana: I didn't – it's not a mistrial. If you give him a mistrial I'm telling you it's a double jeopardy because it's not manifestly necessary.
Mr. Biichle: Your Honor—
Mr. Campana: You can give them that instruction, but I don't think it was responsive to my question.
Mr. Biichle: I'll take the risk whether it's double jeopardy, but I'm taking that risk, Your Honor, that's a mistrial and I move for it right now. It's gotta be. That's the second inappropriate thing that occurred. He know what he was doing and you know he knew what he was doing. It's a mistrial and I want it.
Mr. Campana: I don't think it's inappropriate at all for me to explain to the Jury that because there is serious consequences that flow that's why you have to do your duty to establish guilt beyond a reasonable doubt.
The Court: No, Pete, you violated the ruling. By asking what he was doing you knew that he had sex with her and by asking that question now, what's she going to say? What is she going to say? She's going to say--
The Court: No. No.
Mr. Campana: I didn't say what did you and he do I said what was he doing.
Mr. Biichle: Your Honor, make the decision. It's a mistrial.
The Court: I have to grant it. I think you 've asked the wrong question.
Mr. Campana: It's over my objection.
The Court: I understand it's over your objection.
Mr. Campana: And we're going to make a motion that double jeopardy applies. I don't think it's manifestly necessary, Judge. You can instruct the Jury.
The Court: I can instruct the Jury to what? They are already aware—
Mr. Campana: To disregard that she had sex.
The Court: No, wait a minute. Disregard they had sex.
Mr. Campana: You do it all the time when -- we do it all the time when it comes to–
Mr. Biichle: It's the Rape Shield.
Mr. Campana: Listen, the Defendant was convicted of perjury, but you can only consider that in determining his credibility you can't really consider that. It's the same kind of thing.
Mr. Biichle: Your Honor, the interest of justice have been aborted, it's a mistrial. We'll do it again.
Mr. Campana: No you won't because I'm filing a motion.
Mr. Biichle: File a motion, Pete.
Mr. Campana: Judge–
Mr. Biichle: If you are so sure it's double jeopardy then--
Mr. Campana: Anything short of -- I mean you can give the instruction that they can disregard the question and the answer.
Mr. Biichle: Your Honor, it's-
Mr. Campana: Why can't you?
The Court: Pete, you know what you did. I mean you can sit there like Little Lord Fauntleroy saying that you are innocent and that you had no idea that it was going to elicit this kind of response.
Mr. Campana: I didn't think she was going to say we were having sex. Honest to God. Honest to God.
The Court: That's crap.

3

> Mr. Campana: I thought he would object.
> Mr. Biichle: I did object.
> The Court: He did object.
> Mr. Campana: Not in time.
> Mr. Biichle: Well, I objected and then --
> The Court: Look, here's the problem. When you ask the question --
> Mr. Campana: I didn't ask were you having sex, Judge.
> The Court: Be quiet.
> Mr. Campana: Judge, don't grant a mistrial.
> The Court: When you ask that question and you require him to object, what do you think? You think the Jury just fell off the banana boat? The guy is coming over at three in the morning and you're asking what did he do and--
> Mr. Campana: I said what he was doing.
> The Court: He objected.
> Mr. Campana: He objected. What are you going to do? You can't grant a mistrial.
> Mr. Biichle: Yes, you can. It's a mistrial. This would be--
> Mr. Campana: They knew when he came over at three in the morning what happened.
> Mr. Biichle: No, they -- well, thank you because you made it clear.
> The Court: You should have let it go there. You should have let it go there.
> Mr. Biichle: I thought you were being clever the way you were doing it, but then–
> The Court: Yes, I did too; but then you took it--
> Mr. Campana: I don't think that question - I don't think that question–
> The Court: No, no, you reached for a bridge too far.
> Mr. Campana: Judge, don't grant a mistrial. I'm telling you. Give them a cautionary instruction.
> The Court: Let's do this.
> Mr. Biichle: No, Your Honor, I 'm not -- Your Honor, I'm going to lose this case because of that. I'm going to lose it and then that little girl is going to walk out of here feeling like a liar, feeling like a dirt bag. I give that guy a fair trial she gets a fair trial because she's on trial just as much as him. It's a mistrial.
> The Court: All right. You got it.

(Doc. 9-1, at 56-62).

Thereafter, the judge re-entered the courtroom, advised the jury they were discharged, and made the following statement:

> THE COURT: You can step down for a minute. Ladies and gentlemen, we just had a heated and lively conversation in my chambers. I think I am constrained to declare a mistrial and you deserve to know why, okay, and I'm going to explain it which is going to make it absolute. There is a very strong and very bright line that we have to follow and it is called the Rape Shield Law. It is an evidentiary ruling which prevents an attack on the victim by any other sexual conduct and it's inadmissible. Who she had sex with during her lifetime, whether she has had premarital sex, whether she was a virgin, all of that is not for the Jury's consumption and the reason for that is that rape and sexual assault trials were turning into attacks on the victim, they were turning into attacks on the victim historically by defense counsel, who would very much -who would sometimes, and I'm not suggesting that Mr. Campana was one of these in any manner, they would run them through the -through

4

> a grinder of their entire sexual history and so the legislature made this bright line. I fear Mr. Campana's question of what did he do when he came in at 3:00 in the morning just crossed that line and that you're going to conclude that well, when Mr. Biichle objects, that it had to be because of the fact that they were having sex. I'm not going to confirm or deny that, but the fact of the matter is that the seed has been planted and it violates the Rape Shield Law and I'm sorry that we have wasted your time on this. I don't know any way around it because I think it is a logical conclusion and that you folks were going to jump to it and that that might may in some way start to influence your decision. So with that I am very, very sorry to have to put you through this. You're dismissed from any further obligation under this jury notice. I'm going to send you back to the jury room. You can turn in your buttons and get your things. I very much appreciate your service in this matter. Just for your edification what will happen is it will be set for another jury selection, another trial; but you'll not be involved in that. So with that, please do with the Court's gratitude. All right.

(Doc. 9-1, at 62-63).

Once the jury was discharged, the following statements were made on the record.

> MR. CAMPANA: Your Honor, can we as soon as the Jury leaves -
> THE COURT: Yea, we can have at it.
> MR. CAMPANA: --I want to put something on the record.
> THE COURT: All right. Yes, Mr. Campana.
> MR. CAMPANA: Just for the record, Your Honor, I asked the question what was he doing. I heard his objection. I didn't hear her answer. Did she answer? Did the Jury hear her answer?
> THE COURT: Yes.
> MR. CAMPANA: I didn't hear it. Did you hear it, Your Honor? Did you hear her answer?
> THE COURT: I think she said that they --
> THE DEFENDANT: She said sex.
> THE COURT: She said sex.
> MR. CAMPANA: She said sex?
> THE COURT: Yeah. I wasn't sure that they heard it that's why I couched it the way that I did.
> MR. CAMPANA: Right. That's what I thought and if they didn't hear that Judge that's all -all right.
> THE COURT: But, Mr. Campana.
> MR. CAMPANA: Honest to God I didn't intentionally try and elicit that.
> THE COURT: Come on, Mr. Campana, you know that that question -- he's over at 3:00 in the morning and you know that -- what she going to say? She's going to say -- what is the most predominant thing that he did? Well, he had sex with me. You know, he didn't turn on the TV. He didn't turn on the light. I mean she's not going to talk about that.
> MR. CAMPANA: All right. That's it?
> THE COURT: It is it.
> MR. CAMPANA: I'll file a motion and we can hear that.
> THE COURT: I don't care what motion you file, Pete, you were wrong.
> MR. CAMPANA: I might have been wrong, but even if I was the curative you can give them a curative instruction.
> THE COURT: How can I give them a curative instruction when she's saying he had sex with her that's in clear violation of the Rape Shield Law?
> MR. CAMPANA: Judge, you can instruct the Jury that that has no bearing

5

>on whether the -- the verdict.
>THE COURT: Mr. Campana you crossed a line you should not have crossed. Period. It was -- it really was wrong of you and you know what I might -- I might give a pass to a public defender that has been on the job -- but you have 30 years of experience in this. You do and you should know better. You really should. You know what I'm kind of disappointed . I really am, Pete. You're a better -- you're a better advocate than this.

(Doc. 9-1, at 63-66).

The exchange in chambers, as well as the subsequent statement to the jury, reflect a ruling by the state trial judge that there was a manifest necessity for a declaration of a mistrial due to the conduct of defense counsel which elicited from the victim highly prejudicial information which the judge had excluded in a pre-trial ruling.

Following the declaration of a mistrial, Petitioner moved in state court to bar his retrial on double jeopardy grounds, arguing that the trial court abused its discretion. (Doc. 9-1, at 75). The trial court denied this motion, observing that "[d]espite defense counsel's protestations to the contrary, it was clear at the time, and remains clear to this court, that the question posed by defense counsel was intentionally designed to elicit testimony which had, by pre-trial order, been prohibited." (Doc. 9-1, at 77).

Petitioner appealed the decision to the Pennsylvania Superior Court which issued an opinion and order on February 24, 2015, affirming the decision of the trial court denying this motion to dismiss on double jeopardy grounds. (Doc. 9-1, at 79). Petitioner advanced two arguments on appeal as to why the trial court erred in denying his motion to dismiss the charges on double jeopardy grounds. First, he contended that the trial court abused its discretion in its evidentiary ruling regarding the exclusion of the evidence of the granddaughter's sexual conduct. Second, that the trial court abused its discretion in declaring a mistrial as there was no manifest necessity. *Id*.

In its opinion, the Superior Court of Pennsylvania expressly found that exclusion of the testimony was well within the trial court's discretion under Pennsylvania's rape shield law. The appellate court also found that the declaration of a mistrial in this case was compelled by a manifest necessity, and held that defense counsel's explanation that he did not endeavor to elicit this prejudicial information "strains credulity." (*Id.* at 87). The appellate

6

court also found that the trial court's reasoning that this prejudicial conduct could not have been cured by a cautionary instruction was "sound." (*Id.* at 88). Having reached these findings, the Superior Court upheld the mistrial declaration and the denial of Petitioner's motion to dismiss on double jeopardy grounds. *Id.*

In light of that ruling, on June 30, 2016, Petitioner filed the instant habeas corpus petition seeking a pre-trial declaration from the federal courts that Petitioner's retrial would violate double jeopardy principles. (*See* Doc. 1).

On August 25, 2016, Magistrate Judge Carlson issued the instant R&R (Doc. 11). Magistrate Judge Carlson found that,

> a mistrial was compelled in this case due to a manifest necessity. . . . [Petitioner] sought to explore his granddaughter's sexual history based upon speculative claims that this sexual history would somehow be relevant to issues of bias and consent. . . . [T]he presentation of this type of explosive, and excluded, evidence before a jury was fraught with an extraordinary potential for grave prejudice. This prejudice could not reasonably be cured through some cautionary instruction. Therefore, the only remaining course available to the trial judge given this violation of its own order excluding evidence was the declaration of a mistrial.

(Doc. 11, at 11-13).

On September 8, 2016, Petitioner filed his objections to the R&R (Docs. 12, 13). The R&R and the objections thereto are now ripe for review.

## II. Review of a Report and Recommendation

Where objections to the Magistrate Judge's report are filed, the court must conduct a *de novo* review of the contested portions of the report. *Sample v. Diecks*, 885 F.2d 1099, 1106 n.3 (3d Cir.1989) (citing 28 U.S.C. § 636(b)(1)(c)). However, this only applies to the extent that a party's objections are both timely and specific. *Goney v. Clark*, 749 F.2d 5, 6–7 (3d Cir.1984). In conducting a *de novo review*, the court may accept, reject, or modify, in whole or in part, the factual findings or legal conclusions of the magistrate judge. 28 U.S.C. § 636(b)(1); *Owens v. Beard*, 829 F. Supp. 736, 738 (M.D. Pa. 1993). Although the review is *de novo*, the law permits the court to rely on the recommendations of the magistrate judge to the extent it deems proper. *United States v. Raddatz*, 447 U.S. 667, 675–76 (1980); *Goney*, 749 F.2d at 7; *Ball v. U.S. Parole Comm'n*, 849 F. Supp. 328, 330 (M.D. Pa.

1994). Uncontested portions of the report may be reviewed at a standard determined by the district court. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985). At the very least, the court should review uncontested portions for clear error or manifest injustice. *Cruz v. Chater*, 990 F. Supp. 375, 376–77 (M.D. Pa. 1998).

### III. Discussion

In his objections to the R&R, which mirror his petition for writ of habeas corpus, Petitioner contends that he is entitled to habeas relief for the following reasons:

> (a) It is not clear from the record that the jury, in fact, heard the complainant's statement that "we were having sex". This issue was raised by Petitioner in his Brief in Support of his Petition for Writ of Habeas Corpus, but was not addressed by the United States Magistrate Judge. Furthermore, neither the trial court nor the Superior Court of Pennsylvania stated anything of significance on this issue;
>
> (b) It is clear from the record that the trial court declared a mistrial in a matter of minutes after the incident leading to the declaration occurred. Therefore, the record shows that the Trial Court did not engage in a "scrupulous exercise of judicial discretion" which led it "to the conclusion that a termination of trial was manifestly necessary". Indeed, the trial court granted the assistant prosecutor's motion for a mistrial within a matter of fifteen minutes after the complainant's statement was made and argument on the issue was held in chambers; and
>
> (c) Neither the United States Magistrate Judge nor the Trial Court nor the Superior Court stated its reasons for determining that a curative instruction would not have been sufficient to cure any prejudice that may have resulted from the complainant's statement.

(Doc. 12, at 2-3).

**A.     Habeas Corpus Review**

Congress's general grant of habeas authority to the federal courts appears in 28 U.S.C. § 2241, which extends the writ to, among others, persons "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). It is under that section that courts have recognized pretrial detainees's right to pursue habeas relief. *See Girts v. Yanai*, 600 F.3d 576, 587 (6th Cir.2010).

The standards that apply to § 2241 petitions are significantly less demanding that those applicable to other habeas statutes, such as § 2254. The First, Fifth, Ninth, and Tenth Circuits have concluded that the deference that § 2254(d) requires never applies to habeas

petitions brought under § 2241. *See Martinez v. Caldwell*, 644 F.3d 238, 242 (5th Cir.2011); *Walck v. Edmondson*, 472 F.3d 1227, 1234-35 (10th Cir.2007); *Stow v. Murashige*, 389 F.3d 880, 885-86 (9th Cir.2004); *Gonzalez v. Justices of Mun. Ct. of Boston*, 382 F.3d 1, 6-7 (1st Cir.2004). As the Fifth Circuit stated in *Martinez*, "[t]he deferential standard afforded to state court decisions, which is specifically articulated in § 2254, is not included in the text of § 2241." 644 F.3d at 242. Furthermore, the Antiterrorism and Effective Death Penalty Act of 1996 significantly amended § 2254(d) but left untouched § 2241, and courts operate under the assumption that "'Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.'" *Id.* (quoting *City of Chicago v. Environmental Def. Fund*, 511 U.S. 328, 338, 114 S.Ct. 1588 (1994)).

Therefore, I agree with other courts and hold that habeas petitions governed by § 2241 are not subject to the heightened standards contained in § 2254(d). As such, I find that Magistrate Judge Carlson's *de novo* review of the state court proceedings in addressing the instant petition for habeas relief was proper. *See Martinez*, 644 F.3d at 242; *Walck*, 472 F.3d at 1235.

**B.   The Double Jeopardy Clause**

The Fifth Amendment's Double Jeopardy Clause, applicable to the states through the Due Process Clause of the Fourteenth Amendment, *Benton v. Maryland*, 395 U.S. 784, 787, 89 S.Ct. 2056 (1969), "protects a criminal defendant from repeated prosecutions for the same offense." *Oregon v. Kennedy*, 456 U.S. 667, 671, 102 S.Ct. 2083 (1982). That protection, however, is not absolute, and the Clause does not guarantee that the state's interest in enforcing its criminal laws against a defendant will be vindicated in a single trial. *Id*. at 673, 102 S.Ct. 2083.

Although it has long been established that there is power in the federal courts to consider on habeas the merits of a constitutional defense to a state criminal charge in advance of a final judgment of conviction, *Ex parte Royall*, 117 U.S. 241, 253, 6 S.Ct. 734 (1886), considerations of federalism counsel strongly against exercising the power except in the most extraordinary circumstances. *Braden v. 30th Judicial Circuit Court of Kentucky*,

410 U.S. 484, 489-91, 93 S.Ct. 1123 (1973). Nevertheless, the Double Jeopardy Clause allows retrial after the declaration of a mistrial when the defendant's "valued right" to a verdict from an empaneled jury is "subordinate[] to the public's interest in fair trials designed to end in just judgments." *Wade*, 336 U.S. at 689, 69 S.Ct. at 837. The established rule is that after a mistrial is declared, retrial is barred unless the defendant consented to the mistrial, or there was "manifest necessity" for the mistrial. *See, e.g.*, *Washington*, 434 U.S. at 505, 98 S.Ct. at 830.

Here, because it is clear that Petitioner objected to the declaration of a mistrial, the central question is whether manifest necessity existed for the mistrial.

**C.    Manifest Necessity**

The U.S. Supreme Court articulated the "manifest necessity" doctrine in *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), where the Court first enunciated the enduring test for determining whether double jeopardy bars retrial after a mistrial:

> [I]n all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.

*Id*. at 580.

The *Perez* approach "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." *Illinois v. Somerville*, 410 U.S. 458, 462, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). Instead, *Perez* prescribed a case-by-case approach, taking into account all the circumstances to determine whether there was a manifest necessity for the mistrial declaration. *See Cameron*, 953 F.2d at 244 (manifest necessity analysis is fact-intensive); *Perez*, 22 U.S. at 580, 9 Wheat. 579 (the power to declare a mistrial "ought to be used with the greatest caution, under urgent circumstances, and for plain and obvious causes").

In the years since, the Supreme Court has "explicitly declined the invitation of litigants to formulate rules based on categories of circumstances which will permit or preclude retrial." *Jorn*, 400 U.S. at 480; *see also Wade*, 336 U.S. at 691 (noting that courts must take "all circumstances into account" when deciding whether mistrial is appropriate, thereby precluding the application of "a rigid formula"). Thus, the manifest necessity inquiry is a flexible one, allowing the reviewing court to analyze the trial court's exercise of discretion in light of the particular facts and circumstances of each individual case.

Here, Petitioner argues that the mistrial declaration was not supported by manifest necessity. Specifically, he argues that the trial judge failed to consider less drastic alternatives, such as instructing the jury to disregard the impermissible statement, and that he did not engage in a "scrupulous exercise of judicial discretion" in granting the mistrial. He also argues that it is not clear from the record that the jury actually heard the granddaughter's response. (Doc. 12, at 2-3). I will address each claim in turn.

### 1. Jury Instruction and Scrupulous Exercise of Judicial Discretion

I find that the trial judge acted rationally and responsibly in granting a mistrial. Manifest necessity to declare a mistrial existed because Petitioner's counsel, Mr. Campana, exposed the jury to irrelevant and inadmissible information and the amount of prejudice that was engendered was not minuscule. Despite the clear and precise limitation imposed by the trial court, Mr. Campana elicited the very testimony which had been forbidden by the pre-trial ruling.

The trial judge concluded that Mr. Campana's question and response thereto caused incurable prejudice because learning that the victim had sex with her ex-boyfriend shifted the jury's focus from the culpability of the alleged sexual perpetrator toward the virtue and chastity of the granddaughter.[2] Mr. Campana was well aware that the granddaughter's

---

[2] As the judge explained to the jury:
> [Rape Shield Law] is an evidentiary ruling which prevents an attack on the victim by any other sexual conduct and it's inadmissible. Who she had sex with during her lifetime, whether she has had premarital sex, whether she was a virgin, all of that is not for the Jury's consumption and the reason

11

sexual history had been found to be irrelevant and in direct contravention of the Rape Shield Law, and, as such, excluded from the trial. Thus, the trial judge decided that the potential for prejudice became irreparable when Mr. Campana began to litigate the victim's chastity in front of the jury. As the prosecutor aptly stated during the heated exchange in chambers, "[the granddaughter is] on trial just as much as [the accused]." (Doc. 9-1, at 61).

There is no doubt that the aim of such evidence was to portray the victim in a negative light. As the trial judge later concluded, "it was clear at the time, and remains clear to this court, that the question posed by defense counsel was intentionally designed to elicit testimony which had, by pre-trial order, been prohibited." (*Id.* at 77). The Pennsylvania Superior Court agreed and concluded that Mr. Campana's efforts to explain his behavior at trial "strain[] credulity." (*Id.* at 87). I agree. In all, Mr. Campana's cross-examination was likely to prejudice the jury and affect its ability to reach an impartial verdict. As the trial judge explained in his opinion, "the court believed [that] any verdict would not be based solely on relevant evidence." (*Id.* at 77).

No juror could have been expected to put the victim's statement out of his or her mind. In fact, the trial judge believed that a cautionary instruction would not have effectively cured "the inflammatory nature of the evidence" to remedy the bias Mr. Campana had instilled in the jury. (*Id.* at 78). Petitioner, however, argues that a curative instruction to an answer eliciting information that was specifically prohibited by the trial judge would have cured all prejudice. (Doc. 12, at 2-3). Put another way, he argues that despite the trial judge's unequivocal order that a jury not hear the prohibited and prejudicial information, the judge should have let the jury proceed to a verdict having heard the prohibited and prejudicial information. The record clearly reflects that the trial judge considered, discussed, and then rejected less drastic options to granting a mistrial such as the grant of a curative instruction. (*See, e.g.*, Doc. 9-1, at 58-59). Further, in addressing and dismissing the jury,

---

for that is that rape and sexual assault trials were turning into attacks on the victim.
(Doc. 9-1, at 62).

the judge explained that "the seed has been planted . . . [and] you folks were going to jump to it and that may in some way start to influence your decision." (*Id.* at 63). As the judge later elaborated in his written opinion, "[a]t common law, and to some extend today, a rape victim often suffered secondary abuse at the hand of the judicial system through aggressive defense counsel who 'essentially put the victim on trial.'" (Doc. 1, at 7 (quoting *Commonwealth v. Smith*, 599 A.2d 1340, 1342 (Pa. Super 1999)). As such, I find that the trial judge's decision was sound, and mistrial was appropriate.

In finding manifest necessity, I am guided by the Supreme Court's elaboration that "the key word 'necessity' cannot be interpreted literally; instead ... we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Washington*, 434 U.S. at 506, 98 S.Ct. at 831. In answering the question of whether this "high degree" of necessity existed at the trial court, reviewing courts should apply greater scrutiny in some cases than they would in others. In *Washington*, the Supreme Court explained that "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." *Id.* at 508. In contrast, more deference to the trial judge is appropriate when, as is the case here, the mistrial is based upon the trial judge's belief that the jury may be biased. *Id.* at 509-10.

Here, the situation faced by the trial judge was not one which presented "obvious and adequate alternatives" to aborting the trial, *see Glover v. McMackin*, 950 F.2d 1236, 1242 (6th Cir.1991), or one in which a simple corrective instruction would have sufficiently protected against juror bias. *See Harpster*, 128 F.3d at 330 (amount of prejudice that could have resulted was miniscule); *United States v. Reesor*, 10 Fed.Appx. 297, 304 (6th Cir. 2001) (mistrial is appropriate where "erroneously admitted evidence is of an exceptionally prejudicial character, such that its withdrawal from consideration by the jury cannot be expected to remove the harm"); *United States v. Lott, No. 96-6700*, 1998 WL 384611 at *2 (6th Cir. June 19, 1998) (mistrial must be ordered where improperly admitted evidence is

so prejudicial that the jury cannot be trusted to disregard it).

In addition, the Supreme Court has made clear that "in passing on the propriety of a declaration of mistrial granted at the behest of the prosecutor or on the court's own motion," the reviewing court must "balanc[e] 'the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him ...' against the public interest in insuring that justice is meted out to offenders." *United States v. Scott*, 437 U.S. 82, 92, 98 S.Ct. 2187 (1978) (quoting *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033 (1963)). Having balanced these significant interests, I find that the administration of justice requires me to accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper statement. *See Arizona v. Washington*, 434 U.S. 497, 513-14, 98 S.Ct. 824 (1978) (a trial judge's decision to declare a mistrial based on her assessment of juror bias is entitled to great deference). This is because the trial judge

> has seen and heard the jurors during their *voir dire* examination. He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be.

*Arizona v. Washington*, 434 U.S. 497, 513–14, 98 S. Ct. 824, 834 (1978) (quoting *Wade v. Hunter*, 336 U.S. 684, 687, 69 S. Ct. 834, 836 (1949)).

The Supreme Court's ruling in *Washington* is instructive. There, the trial court declared a mistrial in the second trial of the defendant after defense counsel made improper comments during opening argument and attempted to introduce evidence of prosecutorial misconduct in the earlier trial. The prosecution moved for a mistrial on the grounds of potential juror bias. The Supreme Court pointed out that the trial judge's decision that the jury was biased was entitled to great deference, but also recognized that it still had a duty to inquire into whether the judge exercised sound discretion. It explained that "[t]he trial judge ... 'must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his

confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.'" *Id.* at 514, 98 S.Ct. at 835 (quoting *Jorn*, 400 U.S. at 486, 91 S.Ct. at 557-58). The Court concluded that manifest necessity existed for a mistrial in *Washington* because defense counsel, as is the case here, had "aired improper and highly prejudicial evidence" and because the trial judge, "evincing a concern of the possible double jeopardy consequences of an erroneous ruling, ... gave both the defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial." *Id.* at 515-16.

Indeed, the record in the instant case confirms that the trial judge acted scrupulously in the exercise of his discretion in handling the sensitive problem of potential juror bias created by Mr. Campana's improper conduct. The judge made an effort to ascertain the extent of the damage, explained to Mr. Campana why his cross-examination violated the pre-trial ruling, considered whether the impermissible and irrelevant statement could have resulted in juror bias, gave the parties an opportunity to state their positions, and explored the available alternative of giving a curative instruction. (*See* Doc. 9-1, at 56-62). The judge may well have been angry at Mr. Campana for his remarks; indeed, the record makes it clear that he was. (*See, e.g.*, *id.* at 60-61). His displeasure with Mr. Campana for directly violating his order, however, does not make his ultimate grant of a mistrial any less sound.

In all, the question before me is not whether there was room for improvement in the trial judge's handling of the matter. The dispositive inquiry, rather, is whether the record shows that the trial judge was mindful of the risk of juror bias, the possibility of a double jeopardy bar, and the alternatives to mistrial. In other words, whether the judge abused his discretion in granting the prosecutor's request for a mistrial over Mr. Campana's objection. Merely because the trial court chose not to pursue other alternatives does not mean that the court abused its discretion. *See Crawford*, 646 F.2d at 819-20. I find that the judge fully discharged his duties to ensure a fair trial for all. As the judge stated, "a fair trial is [in the] interest of not only the defendant, but also of the public, which has a compelling interest in justice for *all*, which this court believes clearly includes the victim." (Doc. 1, at 8 (citations omitted) (emphasis in original)).

**2. Dispute Whether the Jury Actually Heard the Impermissible Statement**

Petitioner next argues that it is not clear from the record that the jury heard the granddaughter's statement. (Doc. 12, at 2). I disagree.

The trial judge confirmed several times that he heard the granddaughter say the impermissible statement (*See, e.g.*, Doc. 9-1, at 58, 59, 64, 65), despite the following exchange that occurred after the jury was dismissed.

> MR. CAMPANA: Just for the record, Your Honor, I asked the question what was he doing. I heard his objection. I didn't hear her answer. Did she answer? Did the Jury hear her answer?
> THE COURT: Yes.
> MR. CAMPANA: I didn't hear it. Did you hear it, Your Honor? Did you hear her answer?
> THE COURT: I think she said that they --
> THE DEFENDANT: She said sex.
> THE COURT: She said sex.
> MR. CAMPANA: She said sex?
> THE COURT: Yeah. I wasn't sure that they heard it that's why I couched it the way that I did.
> MR. CAMPANA: Right. That's what I thought and if they didn't hear that Judge that's all -all right.

(Doc. 9-1, at 63-66).

In saying "I wasn't sure that they heard it that's why I couched it the way that I did" the trial judge was referring to his earlier statements to the jury that he is "not going to confirm or deny [whether or not the granddaughter and her ex-boyfriend were having sex that night]." (*Id.* at 62). This was clearly done out of an abundance of caution to protect both the victim and the defendant and "couch" any information that might reach the public.

More importantly, Mr. Campana's claim in the preceding colloquy that he did not hear what the granddaughter said is directly contravened by his own statements during the heated exchange in chambers. (*See, e.g.*, *id*. at 60 ("I didn't think she was going to say 'we were having sex'"). Mr. Campana's efforts in trying to plant a seed of doubt as to whether the jury heard the inadmissible statements are disingenuous. Mr. Campana cannot cover up his careless cross-examination (or his blatant disregard of the pre-trial ruling) by manufacturing a dispute as to what was said by the witness, when, in fact, the record clearly shows that there is no dispute as to what was said. This is confirmed by five people present in the courtroom that day, most notably by the *defendant himself* who admitted that "she

16

said sex" (*Id.* at 64), but also the stenographer, the prosecutor (*Id.* at 56), the judge (*Id.* at 58, 59, 64, 65), and Mr. Campana (*Id.* at 58-59, 60), no matter how hard he now tries to turn this into a genuine dispute. There is no genuine dispute.

In light of the above, Mr. Campana's attempts at manufacturing uncertainty are futile. As the appellate court said, his explanations as to his cross-examination "strain credulity," and I find that they equally strain credulity as to his instant claims that he did not hear the granddaughter's answer or was unsure if the granddaughter answered the question at all. (*See* Doc. 10, at 8). If the five aforementioned people present at trial heard what the witness said, as evidence shows, there is no reason to doubt that the members of the jury did not.

### V. Conclusion

Petitioner's double jeopardy claim has now received multiple levels of review and has yielded several carefully reasoned opinions, among which there is consensus. The state trial court, the state appellate court, the magistrate judge, and now this Court all agree that a retrial in this case would not violate the constitutional prohibition on double jeopardy and that Petitioner should be retried.

Fundamentally, there are only two explanations for Petitioner's counsel's behavior at trial: either he was careless and elicited an answer that he truly did not intend to elicit, or he was ignorant of the trial court's pre-trial ruling. In any case, his arguments and explanations fail, and because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not be issued. The Commonwealth is free to proceed with the retrial.

For the above stated reasons, I will adopt the R&R (Doc. 11) in its entirety and will deny the petition for a writ of habeas corpus, which will be dismissed with prejudice.

An appropriate order follows.

November 4, 2016  /s/ A. Richard Caputo
Date  A. Richard Caputo
  United States District Judge